CASTLE ROSE, INC., APPELLANT, V. PHILADELPHIA BAR AND GRILL OF ARIZONA, INC., ET AL., APPELLEES.
576 N.W. 2d 192

Filed March 27, 1998. No. S-96-967.

Thomas E. Whitmore, of Monen & Whitmore, and Sandra Markley for appellant.

Michael W. Heavey, P.C., for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

CAPORALE, J.

The district court sustained the special appearance filed by the defendant-appellee Philadelphia Bar and Grill of Arizona, Inc., and subsequently dismissed the cause of the plaintiff-appellant, Castle Rose, Inc. The defendants-appellees Paul D. Kogel, David T. Robinson, and Thomas D. LeClair were all shareholders of the Arizona corporation. Asserting that the district court erred in finding it lacked personal jurisdiction over the Arizona corporation, Castle Rose appealed to the Nebraska Court of Appeals. Under our authority to regulate the caseloads of that court and this court, we removed the matter to our docket. As the record sustains Castle Rose's assignment of error, we reverse, and remand for further proceedings.

The scope of our review is controlled by the rule that when a jurisdictional question does not involve a factual dispute, its determination is a matter of law, which requires an appellate court to reach a conclusion independent from the trial court's conclusion on the jurisdictional issue. See, *Crete Carrier Corp. v. Red Food Stores, post* p. 323, 576 N.W.2d 760 (1998); *Becker v. Nebraska Acct. & Disclosure Comm.*, 249 Neb. 28, 541 N.W.2d 36 (1995); *Chrysler Corp. v. Lee Janssen Motor Co.*, 248 Neb. 281, 534 N.W.2d 568 (1995).

Clyde Pittman was the president of Country Line Corporation, which conducted its business at offices located in Bellevue, Nebraska. It engaged in the development of food-service operations and franchised enterprises under the names "Philadelphia Bar and Grill" and "Mickey Finn's." Country Line was succeeded by Concepts 2000, Inc., and on January 1, 1995, Castle Rose purchased Concepts 2000. We henceforth refer to Country Line as if it had at all times been Castle Rose. As a franchisor, Castle Rose provided expertise and guidance to people wishing to enter into the restaurant business. It developed all menu items of its franchises in Nebraska, where it also designed the layout and appearance of the restaurants and developed the operating procedures.

In 1989, Wayne Thompson, a Castle Rose franchisee in Albert Lea, Minnesota, informed Pittman that Kogel was interested in a franchise in Arizona. Pittman does not recall who made the initial contact, but he traveled to Arizona to meet with Kogel and Robinson for 3 days in late December 1989 or early January 1990.

It is Pittman's understanding that Kogel had made a visit to Nebraska prior to their meeting and had visited some of Castle Rose's restaurants. Pittman further testified that although he did not meet with them, Thompson and Kogel were in Nebraska in late 1989.

After their first meeting, Kogel and Robinson mailed some financial information to Pittman in Nebraska. Pittman visited Arizona again in February 1990, after which Robinson and LeClair visited Des Moines, Iowa, to see some of Castle Rose's existing restaurants. The only face-to-face meetings between the parties took place in Iowa and Arizona. Kogel and Robinson signed the franchise agreement for the Arizona corporation in Phoenix, and LeClair signed the agreement in Des Moines.

In early 1990, Castle Rose and the Arizona corporation entered into a franchise agreement whereby the Arizona corporation would operate a Philadelphia Bar and Grill franchise in Arizona for a period of 20 years. Castle Rose agreed to assist, guide, and supervise the Arizona corporation in initializing its franchise, and to provide continual advice, guidance, and supplies for the franchise's operation. This included the training of

key personnel; the furnishing of recipes and directions for proper preparation; the designation of a food supplier and negotiation of the prices for raw materials for preparation, service, and sale of beverages and menu food items; the frequent inspecting of the restaurant and consulting with its key personnel; and the selling and supplying of quantities of its spice mixture.

Under the terms of the contract, the Arizona corporation agreed to pay Castle Rose an initial fee, plus weekly royalties and compensation. The contract also required the Arizona corporation to prepare and submit weekly, monthly, and annual reports to Castle Rose and to operate in conformity with the standards of quality and service as established by Castle Rose. The contract provides that its terms be interpreted and enforced in accordance with Nebraska law.

Personal jurisdiction is the power of a tribunal to subject and bind a particular entity to its decisions. *Concordia Teachers College v. Neb. Dept. of Labor*, 252 Neb. 504, 563 N.W.2d 345 (1997); *Glass v. Nebraska Dept. of Motor Vehicles*, 248 Neb. 501, 536 N.W.2d 344 (1995). Before filing any other pleading or motion, one may file a special appearance for the sole purpose of objecting to a court's assertion or exercise of personal jurisdiction over the objector. *In re Interest of Rondell B.*, 249 Neb. 928, 546 N.W.2d 801 (1996); *Williams v. Gould, Inc.*, 232 Neb. 862, 443 N.W.2d 577 (1989). The burden of proof rests upon the plaintiff confronted with a special appearance to demonstrate the court's personal jurisdiction over the defendant. *Crete Carrier Corp. v. Red Food Stores, post* p. 323, 576 N.W.2d 760 (1998); *Crystal Clear Optical v. Silver*, 247 Neb. 981, 531 N.W.2d 535 (1995); *Wagner v. Unicord Corp.*, 247 Neb. 217, 526 N.W.2d 74 (1995).

Because Nebraska's long-arm statute, Neb. Rev. Stat. § 25-536 (Reissue 1995), expressly extends Nebraska's jurisdiction over nonresidents having any contact with or maintaining any relation with Nebraska as far as the U.S. Constitution permits, we need address only whether the Arizona corporation had such minimum contacts with Nebraska that the exercise of personal jurisdiction would not offend federal constitutional principles. See, *Crystal Clear Optical, supra*; *Wagner, supra*.

Thus, we must determine whether a Nebraska court's assertion or exercise of jurisdiction over the Arizona corporation would be consistent with due process.

The benchmark for determining if the exercise of personal jurisdiction satisfies due process is whether the defendant's minimum contacts with the forum state are such that the defendant should reasonably anticipate being haled into court there. *Wagner, supra*; *24th and Dodge Ltd. v. Commercial Nat. Bank*, 243 Neb. 98, 497 N.W.2d 386 (1993).

> [D]ue process for personal jurisdiction over a nonresident defendant requires the defendant's minimum contacts with the State of Nebraska so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). To determine whether a court has personal jurisdiction over a nonresident defendant, the court must examine the quality and nature of the nonresident's activities and ascertain that the nonresident has sufficient minimum contacts with the forum state to satisfy the requisite due process for assertion or exercise of personal jurisdiction. *Internat. Shoe Co. v. Washington, supra.*

> Fairness and reasonableness, essential to due process in personal jurisdiction over a nonresident defendant, require that the defendant's contact with the forum state must be of a quality and nature that the defendant "should reasonably anticipate being haled into court" in the forum state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980). The minimum contacts standard, expressed in *Internat. Shoe Co. v. Washington, supra*, supplies "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where the conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson, supra* at 297.

A defendant's purposeful act, directed to the forum state, not merely the unilateral activity of another who claims a relationship to the defendant, connects the

defendant to the forum state. *Hanson v. Denckla*, 357 U.S. 235, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958). *Williams v. Gould, Inc.*, 232 Neb. 862, 876-77, 443 N.W.2d 577, 587 (1989).

> "[W]hether a Nebraska court has personal jurisdiction over a nonresident defendant depends on whether the defendant's contacts with Nebraska are the result of unilateral acts performed by someone other than the defendant, or whether the defendant himself acted in a manner which creates substantial connections with Nebraska, resulting in the defendant's 'purposeful availment' of the benefits and protections of Nebraska law."

*Wagner*, 247 Neb. at 223, 526 N.W.2d at 78, quoting *Williams, supra.*

> " 'The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' "

*24th and Dodge Ltd.*, 243 Neb. at 102, 497 N.W.2d at 390, quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).

An individual's contract with a party within a forum state does not, in and of itself, provide the necessary contacts for personal jurisdiction in the forum state. *Burger King Corp., supra; Williams, supra.* To determine whether a defendant's contract supplies the contacts necessary for personal jurisdiction in the forum state, the court is to consider the parties' prior negotiations and future contemplated consequences, along with the terms of the contract and the parties' actual course of dealing. *Burger King Corp., supra; Williams, supra.* It is sufficient for purposes of due process that suit is based on a contract which had substantial connection with that state. *McGowan Grain v. Sanburg*, 225 Neb. 129, 403 N.W.2d 340 (1987).

The facts in the instant case are substantially similar to those in *Burger King Corp., supra.* Therein, Burger King Corporation, a Florida corporation whose principal offices were in Miami, entered into a contract which provided that John Rudzewicz and Brian MacShara would open and operate a Burger King franchise in Michigan for a period of 20 years and that all disputes be governed by Florida law.

Burger King instructed its franchisees on how to operate the restaurant, provided market research and advertising assistance, trained the franchisees in restaurant management, and provided accounting, cost-control, and inventory-control guidance. The franchise agreement allowed franchisees "to tap into Burger King's established national reputation and to benefit from proven procedures for dispensing standardized fare . . . enabl[ing] them to go into the restaurant business with significantly lowered barriers to entry." 471 U.S. at 465. In exchange, franchisees paid Burger King an initial amount, plus monthly royalties. Burger King also imposed national standards of uniformity and undertook regulation to ensure that franchisees followed the national standards.

Burger King filed a diversity action in the federal district court in Florida, alleging that Rudzewicz and MacShara had breached their franchise obligations. In holding that the district court's exercise of jurisdiction did not violate Rudzewicz' or MacShara's due process rights, the U.S. Supreme Court noted:

> In this case, no physical ties to Florida can be attributed to Rudzewicz other than MacShara's brief training course in Miami. Rudzewicz did not maintain offices in Florida and, for all that appears from the record, has never even visited there. Yet this franchise dispute grew directly out of "a contract which had a *substantial* connection with that State." [Citation omitted.] Eschewing the option of operating an independent local enterprise, Rudzewicz deliberately "reach[ed] out beyond" Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization. [Citation omitted.] Upon approval, he entered into a carefully structured

20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida. In light of Rudzewicz' voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the "quality and nature" of his relationship to the company in Florida can in no sense be viewed as "random," "fortuitous," or "attenuated."

(Emphasis in original.) *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479-80, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).

The *Burger King Corp.* Court also reasoned that the choice-of-law provision "reinforced [Rudzewicz'] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." 471 U.S. at 482. It noted that in reversing the district court's order, the U.S. Court of Appeals for the 11th Circuit gave insufficient weight to that provision which declared that although suits need not be brought in Florida, the contract would be governed and construed under and in accordance with Florida law. Thus, we conclude that the existence of a Nebraska choice-of-law clause is a factor to be considered in determining whether a party should reasonably anticipate being haled into court in Nebraska.

By entering into the franchise agreement, the Arizona corporation deliberately "reached out" beyond Arizona and created a long-term relationship with and voluntarily assumed obligations with Castle Rose under a contract which has a substantial connection to Nebraska. Because the facts in *Burger King Corp.* are so closely on point, there can be little doubt that subjecting the Arizona corporation to the jurisdiction of the Nebraska courts would not offend due process. "[T]he Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger King Corp.*, 471 U.S. at 474.

The Arizona corporation's emphasis on the fact that the parties never met in Nebraska is of no significance, for a defendant's physical presence in Nebraska is not controlling on the question of whether the contacts with Nebraska were sufficient to subject the defendant to suit in Nebraska. *Williams v. Gould, Inc.*, 232 Neb. 862, 443 N.W.2d 577 (1989).

Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

(Emphasis in original.) *Burger King Corp.*, 471 U.S. at 476.

Accordingly, the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.